# EXHIBIT 5

**PUBLIC-REDACTED VERSION**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION


MONARCH NETWORKING

SOLUTIONS LLC,

        Plaintiff,             CIVIL ACTION NO.

    v.                  2:20-CV-00015-JRG

CISCO SYSTEMS, INC.,

        Defendant.

- - - - - - - - - - - - - - - - -


 ** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **


    VIDEOTAPED DEPOSITION of MICHAEL J. LASINSKI,

taken remotely, on February 17, 2021 commencing at

9:10 a.m. eastern time, before Jeffrey Benz, a

Certified Realtime Reporter, Registered Merit

Reporter and Notary Public within and for the

State of New York.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Lasinski, Michael J.                                February 17, 2021

2 (Pages 2 to 5)

---

**2**

1  A P P E A R A N C E S :
2
3  SUSMAN GODFREY L.L.P.
4  Attorneys for Plaintiff
5      1201 3rd Avenue
6      Seattle, Washington  98101
7  BY:  KATHERINE PEASLEE, ESQ.
8  KPeaslee@susmangodfrey.com
9  206-505-3828
10
11  DESMARAIS LLP
12  Attorneys for Defendant
13      230 Park Avenue
14      New York, New York  10169
15  BY:  TAMIR PACKIN, ESQ.
16  tpackin@desmaraisllp.com
17  212-351-3403
18
19
20  ALSO PRESENT:
21      JOE TOWNSEND, Videographer
22      DAVID NELSON, Videographer Assistant
23
24
25

---

**3**

1                 INDEX
2  MICHAEL J. LASINSKI
3  Examination by:                 Page
4      MR. PACKIN                 6
5
6                 EXHIBITS
7  Number          Description          Page
8  Exhibit 1   PDF copy of expert report   7
9      of Michael Lasinski
10  Exhibit 2   Native Excel versions of   7
11      Exhibit C
12  Exhibit 3   Preliminary EGM MAP        73
13      Pricing
14  Exhibit 4   Cisco-MON-EDT-00009908    130
15  Exhibit 5   Cisco Adaptive Security   133
16      Appliance Mapping,
17      Cisco-MON-EDT-00030946
18  Exhibit 6   NAICS code for 334118    160
19  Exhibit 7   NAICS code 334210        163
20  Exhibit 8   iPhone Agreement Amended  223
21      and Restated Effective
22      January 1, 2017
23  Exhibit 9   Mr. Reading's Expert     252
24      Report
25

---

**4**

1      THE VIDEOGRAPHER:  Here begins the
2  videotape deposition of Michael Lasinski,
3  taken of the matter of Monarch Networking
4  Solutions LLC, v. Cisco Systems, Incorporated
5  and Charter Communications, Incorporated, in
6  the United States District Court, for the
7  Eastern District of Texas, Marshall Division.
8  Case Number 220-CV-00015-JRG.
9      Today's date is February 17, 2021.  The
10  time is 9:10 a.m. eastern.  This deposition
11  is being held remotely via Zoom video
12  conferencing software.
13      The court reporter is Jeff Benz.  I am
14  Joe Townsend, the video camera operator, and
15  we are both here on behalf of Henderson Legal
16  Services.
17      Will counsel please introduce themselves
18  and state whom they represent.
19      MS. PEASLEE:  Katherine Peaslee on
20  behalf of plaintiff Monarch.
21      MR. PACKIN:  Tamir Packin from Desmarais
22  LLP on behalf of Cisco Systems, Inc.
23      THE VIDEOGRAPHER:  Will the court
24  reporter please swear in the witness, after
25  which we can proceed.

---

**5**

1      THE COURT REPORTER:  I'm going to read a
2  stipulation into the record and ask counsel
3  to agree.
4      The attorneys participating in this
5  deposition acknowledge that I am not present
6  in the room and will be reporting this
7  deposition remotely.
8      They further acknowledge that in lieu of
9  an oath administered in person, the witness
10  will be sworn in remotely.
11      The parties and their counsel consent to
12  this arrangement and waive any objections to
13  this manner of reporting.  Please indicate
14  your agreement by stating your name and your
15  agreement on the record.
16      Counsel?
17      MS. PEASLEE:  Katherine Peaslee of
18  Susman Godfrey on behalf of plaintiffs, so
19  stipulated.
20      MR. PACKIN:  Tamir Packin, I agree.
21  MICHAEL LASINSKI,
22      called as a witness, having been first
23      duly sworn by Jeffrey Benz, a Notary
24      Public within and for the State of New
25      York, was examined and testified as

---

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Lasinski, Michael J.                                    February 17, 2021

3 (Pages 6 to 9)

---

**6**

1  follows:
2  EXAMINATION BY MR. PACKIN:
3  Q.  Good morning.
4  **A.  Good morning.**
5  Q.  You've been deposed plenty of times
6  before.  Right?
7  **A.  I have been, numerous times.**
8  Q.  Okay.  So if -- have you -- have you
9  been deposed by Zoom already?
10  **A.  I have, yes.**
11  Q.  Okay.  So, you're familiar with the
12  procedure.  If you don't hear me at any point in
13  time, or don't understand, just let me know, and
14  I'll repeat or rephrase or we'll figure out if
15  there's a technical problem, okay?
16  **A.  Okay.**
17  Q.  And you understand that you're under
18  oath?
19  **A.  I do.**
20  Q.  Did you receive the link to the
21  Henderson share file folder that has the -- has
22  exhibits in it?
23  **A.  I -- I did receive a link, but it does**
24  **not seem to have any exhibits in it.**
25  **Oh, wait, now it does.  I just refreshed**

---

**7**

1  **it.**
2  Q.  Oh, I guess -- I put it in yesterday,
3  but I guess it only goes live once we start the
4  deposition.
5  [redacted]
16  Do you see those?
17  **A.  Yes.**
18  Q.  And do you -- do you have your own copy
19  of your expert report that you're using, a paper
20  copy?
21  **A.  I did, I -- I brought a paper copy, yes.**
22  Q.  Okay.  That -- that's perfectly fine.
23  Are there any notes in that copy of your
24  report?
25  **A.  No.  I mean, just for full disclosure, I**

---

**8**

1  did put the security code for the Zoom today on
2  the front page of it.  But that's the only marking
3  that I put on it.
4  Q.  Okay.  So feel free to look at the paper
5  copy if that's easier for you.  I'm looking at a
6  paper copy myself just because that's how I'm
7  accustomed to doing things, and if we need to try
8  to get on the same page literally, I could share
9  my screen, and we can resync and then go back to
10  the paper copies, but I -- I find it easier to use
11  that one as well.
12  **A.  Okay.**
13  Q.  Can you just confirm that the paper copy
14  that you have in front of you is the same thing as
15  what I've marked as Lasinski Exhibit 1, just so
16  that we've got our Is dotted and Ts crossed?
17  **A.  Sure.  I'm opening the -- the copy now.**
18  **I mean, as far as I can tell it is.  I**
19  **haven't read every -- every page, obviously, of**
20  **the electronic copy, but it's the same number of**
21  **pages, and at least scrolling through it, it looks**
22  **the same.**
23  Q.  Okay.  Great.
24  Other than the -- the physical copy of
25  your report that we've marked as Lasinski

---

**9**

1  Exhibit 1, do you have any other physical
2  documents that you brought with you?
3  **A.  I do not, no.**
4  Q.  Okay.  And Exhibit 2, that's the --
5  those are the native Excel versions of what you
6  provided?  Right?
7  **A.  Yeah.  Except -- something is not right**
8  **in this file.**
9  Q.  Okay.
10  **A.  It looks like some of the links are not**
11  **connecting.  I have like a pound value, pound**
12  **value, pound value in the notes and in some of the**
13  **title screens --**
14  Q.  Okay.  Let me see.
15  **A.  But --**
16  Q.  Let me see why that is.  Let me see if I
17  can get the copy that I have locally, maybe I'll
18  replace it.
19  Problem here.
20  Okay.
21  **A.  Maybe we could look in the preview, let**
22  **me try downloading it from there and see if it**
23  **fixes.**
24  Q.  Yeah, so I think if you download it, it
25  will fix it.  I just downloaded it, and it looks

---

10

1  to have -- doesn't have that pound value.  I think
2  it's just in the preview screen.  That doesn't
3  download all the information for the preview.
4          So you can go ahead and click download
5  on the right so that you have the full thing with
6  all the notes.
7          A.  Yeah, I'm trying to download it now.  It
8  seems like it downloaded, but then it -- it won't
9  open up.
10         Oh, wait, maybe now it will.
11         Okay, now it's -- now I have it.
12         Q.  Is the version of Exhibit 2 that you
13 were able to download, does that have the -- the
14 linking issue, or is that one correct?
15         A.  It's correct now.
16         Q.  Okay, great.
17         A.  It least it appears -- it appears to be.
18         Okay.
19         Q.  Okay.  I'm glad you sorted that out.  I
20 think for the most part, we could use the paper
21 copies instead of the Excels, but if you prefer to
22 refer to the Excel, just let me know, and that way
23 I can open up the same document.
24         I think there's only one part of the
25 questioning where the Excel might be easier

11

1  because I could point to particular cells by
2  letter and number, where the printout obviously
3  doesn't have that, but I'll let you know when --
4  when that is.
5          Otherwise, just let me know if you -- if
6  you prefer that we look at the Excel, and I can
7  look at the Excel with you as opposed to the paper
8  copy.  Okay?
9          A.  Yup.
10         Q.  Okay.
11         Okay.  So let's go ahead and start on --
12 on [REDACTED]
13         And just so you know, for full
14 transparency, the way I generally do this is I
15 sort of march through the report, more or less in
16 order.  Sometimes I skip around a little, but it's
17 more or less just plowing through.
18         So that will give you a sense -- and
19 we'll have some exhibits that you refer to in here
20 that we'll mark as well, but otherwise, it's more
21 or less plowing through.
22         So you -- you'll have a sense, but some
23 modules might take longer than others, but that's
24 the way I do it.  It's no -- no surprises, just
25 trying to find out what you have to say about

12

1  certain things.
2  [REDACTED]
4          A.  Yes.  Correct.
5          Q.  And at the very end, it says that you're
6  being compensated at a rate -- this is in
7  [REDACTED].  Is that
8  right?
9          A.  That is accurate, yes.
10         Q.  How much have you billed and accrued to
11 date?
12         A.  Today, I think that we've billed about
13 [REDACTED]
14         Q.  And --
15         A.  I don't know, you said "accrued."  I --
16 I don't know exactly what January -- yeah, what
17 January's bill will be.
18         Q.  January -- you haven't billed out for
19 January yet; is that right?
20         A.  No, I think it's -- I think that's
21 coming.
22         Q.  And that's -- you served your expert
23 report 12 days in, so presumably there will be
24 [REDACTED]

13

1  [REDACTED]
6          MS. PEASLEE:  Objection to form.
7  [REDACTED]
8          Q.  Oh, sorry.
9          A.  But -- today, and then there will be
10 January billings on top of that.  That's me and my
11 colleagues at Ankura.
12 [REDACTED]
17         Q.  Got it.
18 [REDACTED]
21         Q.  Okay.  Let's go ahead to the next page.
22 Looking under your "Assignment," which is labeled
23 as Section 3.
24 [REDACTED]



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Lasinski, Michael J.                                February 17, 2021

5 (Pages 14 to 17)



### 14

[lines 1-4 redacted]

5  And then you list the patents.  Right?
6  A.  That is accurate, yes.
7  Q.  And then in the next paragraph you say,
8  My investigation into potential recovery of
9  monetary relief began with the necessary
10 assumption that liability would be found against
11 Cisco for the alleged infringement of the patents
12 in suit.
13      Right?
14 A.  That is what it said, you read it
15 correctly.
16 Q.  And so you assume, for the purposes of
17 your analysis, that the patents in suit are valid,
18 and infringed, right?
19 A.  Correct.
20 Q.  And you don't have any opinions on
21 infringement.  Is that right?
22 A.  Correct.
23 Q.  And you don't have any opinions on
24 validity; is that right?
25 A.  Correct.

### 15

1  Q.  So if the jury finds that the patents in
2  suit are all invalid, there will be no damages
3  due, right?
4  A.  Well, my understanding is that that's a
5  legal conclusion, but based on history and other
6  cases that I've worked on, that's what I found.
7  Q.  Okay.  Maybe -- how about this one?  If
8  the jury finds that the patents are not infringed,
9  there will be no value, right?
10 A.  Well, I wouldn't say no value.  My
11 understanding is that there wouldn't be an award
12 of damages, but ultimately, that's a legal
13 conclusion.
14 Q.  Right, there wouldn't be award of
15 damages, but even if you were to try to assess the
16 value to Cisco, if Cisco is not using the patents
17 in suit for non-infringement purposes, the
18 negotiation would result in a zero value because
19 they're not using it, right?
20 A.  For -- for -- Cisco would not have to
21 pay damages, that is accurate, yes.
22 Q.  Oh, God, I'm sorry.  I understand my --
23 lack of clarity of my question.
24      So just to be clear, because I think I
25 said it very inartfully, until I caught on to the

### 16

1  distinction that you were making, if Cisco -- if
2  the jury finds that Cisco is not using the patents
3  in suit, in other words, is not infringing, then
4  the damages would be zero.  Is that right?
5  A.  Again, you know, my understanding is
6  that's always a legal conclusion.  But that's not
7  inconsistent with what I've seen in -- in cases
8  and my history of being a damages expert.
9  Q.  I mean from an -- an economic
10 perspective, that's true as well, in terms of --
11 if Cisco is not using the patent, not infringing
12 the patents in suit, the value of the patents in
13 suit to Cisco would be zero in terms of the
14 negotiation.  Right?
15 A.  They would not have to pay for them,
16 that's right.
[lines 17-25 redacted]

### 17

[lines 1-4 redacted]
5  Q.  You're not a lawyer; is that right?
6  A.  That is correct.
7  Q.  And you're not a technical expert in
8  this case; is that right?
9  A.  That is correct.
10 Q.  You're not an expert on the technology
11 of MAP-T, M-A-P dash T.  Is that right?
12 A.  That is accurate.
13 Q.  And you're also not an expert on MAP-E.
14 Is that right?
15 A.  Again, I'm not a technical expert on
16 MAP-E.  I do have economic standards -- opinions
17 on that, but I'm not a technical expert.
18 Q.  Right.  And you also are not a technical
19 expert in V -- VPLS LSM.  Right?
20 A.  That is right.  Correct.
21 Q.  And so to the extent there's technical
22 discussions in your report about the various
23 technologies, [redacted]
[lines 24-25 redacted] s.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Lasinski, Michael J.                                    February 17, 2021

6 (Pages 18 to 21)



**Page 18**

1    Q.   Now, what you've done in this case is
2  present your opinion as to what the appropriate
3  level of damages are.  Right?
4    A.   Correct.
5    Q.   Now, you're familiar with 35 U.S.C. 284?
6    A.   Yes.
7    Q.   And so, that -- what that says is, Upon
8  finding for the claimant, the Court shall award
9  the claimant damages adequate to compensate for
10  the infringement, but in no event less than a
11  reasonable royalty for the use made of the
12  invention by the infringer, together with
13  interests and costs as fixed by the Court.
14     You're -- you're familiar with that
15  statute?
16    A.   I am, yes.
17    Q.   And so, the analysis that you applied in
18  this case is consistent with the requirements of
19  Section 284; is that right?
20    A.   That is correct.
21    Q.   And within Section 284, what you're
22  focused on for this case is figuring out a
23  reasonable royalty for the use made of the
24  invention by the alleged infringer, right?
25    A.   That is correct.  I have a reasonable

**Page 19**

1  royalty analysis.
2    Q.   Now, to reach your reasonable royalty
3  analysis, you consider several materials from the
4  case, and I -- just for clarity, I've sort of
5  moved on to Section 4, "Information Considered."
6    A.   Is there a question there?
7    Q.   I'm sorry, let me say it again.  I was
8  trying to tell you -- tell you where I was and ask
9  the question at the same time.  So let me try it
10  again.
11     In considering -- or let me say it --
12  say it differently.
13     In forming your opinions in this case,
14  you considered information relevant to the matter.
15  Is that right?
16    A.   That is correct.
17

**Page 20**

1                    ?
2    A.   That is correct.
3    Q.   And so to the ex-- sorry.
4    A.   It is Appendix B.
5    Q.   To -- to the extent a document is not
6  cited in your report or listed in Appendix B, fair
7  to say that you did not consider that document in
8  forming your opinions in this case?
9    A.   Yes.  With two exceptions.
10    Q.   Okay.  What were the exceptions?
11
15    Q.   Okay.
16
24                                            have
25  either of those caused you to want to change or
   revise the opinions that you've laid out in

**Page 21**

1  Exhibit 1, which is your report?
2    A.   No.
3    Q.   You agree that in determining the
4  monetary relief in this case, the -- your economic
5  theory of damages must be tethered to the fact of
6  this case.  Right?
7    A.   Yes.
8    Q.   So other than -- in -- in paragraph 13,
9  you say, It is important to note that the opinions
10  and conclusions contained in this report are based
11  on the information that has been made available to
12  me to date.
13     Do you see that?
14    A.   Yes.
15    Q.   Other than the two additional reports
16  that you mentioned,                       is there any additional
18  information that you considered beyond what's
19  listed in Appendix B to your report?
20    A.   No.
21    Q.   Is it fair to say that the entirety of
22  your opinions in this case are contained within
23  your expert report, which is Exhibit 1?
24    A.   My affirmative opinions, yes.
25    Q.   You're drawing a distinction between

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Lasinski, Michael J.                                February 17, 2021

47 (Pages 182 to 185)



182

1  **when -- then you take into consideration, you**
2  **know, we were already starting to get all those**
3  **other -- all of their other costs paid for, and**
4  **they can earn a profit margin on that.  That's in**
5  **addition to that.  I haven't attempted to**
6  **calculate those additional profits.**
7       Q.   You said they can get all their other
8  costs paid for.  What are you referring to?

183

21       Actually, you know, whatever.  If you
22  can do the math.

25       Q.   Okay.  So -- just taking a -- a big step

184

1  back.

5                     ow is that different than the Nash
6  bargaining approach where you're sitting there and
7  saying, you know, each party is going to get 50 --
8  50/50 percent of the incremental profit in terms
9  of economically?  Is that -- is that different, or
   is it just a different flavor?
10      **A.   Yeah, the Nash bargaining theory is just**
11  **like the 25 percent rule, just some random**
12  **calculation that's being made.**
13           **This is not that.  Obviously I go**
14  **through four steps -- well, five steps, to get to**
15  **this point.  So --**
16      Q.   Well, I mean, most of the steps, in
17  fairness, are to try to figure out what the

22      **A.   I mean, in fairness, each one of the**
23  **steps is -- it -- equally important.**

185

6       Q.   But -- and -- and the profit split
7  methodology is basically you're just comparing --
8  and that -- that's what we talked about earlier
9                              that's
10  basically another way of thinking about it is,

19           **So to make sure that --**
20      Q.   Yes.

24      Q.   Now, a reasonable royalty calculated by
25                        really very highly dependent on

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Lasinski, Michael J.                                     February 17, 2021

48 (Pages 186 to 189)



**186**

1  the profitability of the company that you're
2  dealing with.  Right?
3      A.  Can I just finish?  I was -- I was
4  starting --
5      Q.  I'm sorry.
6      A.  -- that question, so if I could just
7  finish that.
8      Q.  Yeah, I'm sorry.
9      A.  Then on top of that, I just want to make
10  sure that there's numerous areas where I was
11  conservative in my calculations, as I laid out in
12
13      I'm sorry.  So I completely missed your
14
15  last question.
16      Q.  I've got to get -- I've got to remember
17  it now too.
18      Okay.  So now, a reasonable royalty
19  calculated by
20                                              company as
21  whole that you're dealing with.  Right?
22      A.  That's one of the things that you look
23  at is the profitability of the company.
24      Or some (inaudible) like I did here.
25      THE COURT REPORTER:  I didn't hear that

**187**

1  last.
2      A.  For some of the inputs, like, for
3  example, the normal operating profit margin here.
4      Q.  So, if you're calculating a royalty
5  based on a company's profitability in part, is
6  that consistent with a RAND license where you're
7  supposed to give the same royalty to all the
8  different licensees independent of their
9  profitability?
10      A.  Yes.
11      Q.  How -- how is that consistent?
12      A.  Because what we're -- what you're
13  supposed to do is, in my -- based on my work in
14  the RAND context, is use a similar methodology to
15  calculate what a royalty rate is.
16      And as long as you use a similar
17  methodology to calculate what a royalty rate is,
18  you're consistent with the RAND framework.
19      Q.  So you can charge more to a company
20  that's more profitable and less to a company
21  that's less profitable?
22      A.  I'm not a legal expert on this, but my
23  understanding is that there's broad latitude under
24  how you determine royalties, and as long as you
25  treat similar companies similarly, that's allowed.

**188**

1      Q.  Okay.  So let's talk about the --
2  putting aside the -- the conversation about the
3  profit split.  Let's talk about sort of adding up
4  the -- the units to get to your total excess
5  profit calculation.
6      We talked about that, we -- we touched
7  on it briefly, but then we got into the discussion
8  about profit splitting.  So I'd like to reset in
9  terms of tallying the -- the number of units.
10  Okay?
11      A.  Okay.

**189**

21      Q.  Okay.  I -- I'm just looking at my
22  realtime.  I think I may have spoken at the same
23  time but I caught the yes part.
24      So, just to be clear, when you
25  calculated

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Lasinski, Michael J.                                    February 17, 2021

49 (Pages 190 to 193)



**190**

6  And again, I'm just moving my answer
7  from the last time in case we didn't -- didn't get
8  it on the record.
9      I understand that there may be some sort
10 of dispute about that, and that that's a legal
11 issue.  So to the extent that there needs to be an
12 adjustment to that, that's something I could
13 consider.
14     But at this time, I understand that it
15 does not need to necessarily be owned by a service
16 provider, owned or controlled by a service
17 provider.
18     Q.  Got it.
19
20                  But at the same time, you say,
21 a legal dispute, am I correct, that you don't
22 necessarily -- you're not taking a position on
23 that legal dispute, you're just -- your
24 calculation is assuming that whether it's service
25 provider or not does -- doesn't affect the

**191**

1  numbers.  Right?
2      A.  Well, that's not accurate.  Obviously,
3  if -- if you -- if you include service providers
4  or you don't include -- or you -- and -- or you
5  don't include service providers or you include
6  more than just service providers, that does affect
7  the numbers.
8      Q.  Okay.  I'm sorry, I was inarticulate.
9      You said you understand that it's a
10 legal dispute.  You don't have a position one way
11 or the other on that legal dispute, you're just
12 making an assumption with respect to whether or
13 not you should be including service providers, and
14 you're including them based on your assumption.
15 Is that right?
16     A.  Yes.
17     Just to make sure that the record is
18 clear, though, I -- I think you were asking me,
19 when you started this line of question, whether or
20 not you should include service providers.  And
21 now you're asking me whether or not I should
22 include service providers.
23     Q.  Oh.  Yeah, well, I'm sorry.  You're --
24 you're right, as I would expect.
25     And I guess my -- my questions have been

**192**

1  confusing more to you, and your answers have been
2  confusing more to me because I was -- flipped and
3  I was misspeaking.
4      Let me see if I can go back and untangle
5  that mess.  Thank you for that clarification.
6      All right.  Just so that we have a clear
7  record, because I'm having trouble finding it on
8  the -- on the real time here.
13     A.  Correct.
25     Q.  Okay.

**193**

1      But sitting here -- so sitting here
2  today,
7      Q.  Okay.  In tallying up the units for --
8  that included the MAP capability, am I right that
16     Q.  Okay.  And you -- based on your layman's
17 understanding, you're aware that the IPv6 to IPv4
18 interoperability technology is only relevant to
19 edge routers.  Is that right?
20     A.  I mean, that's not inconsistent with my
21 understanding, but I'm not -- I have no opinion on
22 that.
23     Q.  Okay.  So you didn't form any opinions
24 on whether the MAP feature would be valuable to an
25 edge router but not valuable to a -- a core

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Lasinski, Michael J.                                    February 17, 2021

55 (Pages 214 to 217)



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Lasinski, Michael J.                                    February 17, 2021

56 (Pages 218 to 221)



**218**

6  A.  Hold on.  I think --
7  Q.  I'm sorry.  210.  I misspoke, 210.
8  A.  Okay.
9  Q.  You say, At this time, I have not
10 derived royalty indicators by reference to the
11 produced patent -- the produced licenses; however,
12 it is

15 Right?
16 A.  Correct.

**220**

17 Q.  Okay.  So going forward to paragraph
18 213, you say that you're not aware of any viable
19 alternatives to the patents in suit that would
20 have been known and accepted during the period
21 leading up to hypothetical negotiation.  Right?
22 A.  Correct.
23 Q.  And I -- I think we covered this.  I
24 apologize.  I may have gotten ahead of myself
25 earlier, but -- you don't personally have opinions

**219**

10 Q.  And the same thing is true with the --
11 or let me step back.
12    There is no dispute in this case about
13 Cisco paying a lump sum.  You and Mr. Reading
14 agree on that, right?
15 A.  Correct.

**221**

1  on non-infringing alternatives.  You rely on -- on
2  Dr. Walker; is that right?
3  A.  Yes.
4  Q.  And you don't have a sufficient
5  technical background to know whether a particular
6  technology would be technically acceptable.
7  Right?
8  A.  I don't -- I don't have -- yes, I do not
9  have that background.
10 Q.  And you haven't done any analysis about
11 whether a particular technology would be
12 economically accessible, right?  Acceptable.
13 A.  Okay.
14 Q.  Let me say it -- let me say it again.
15 I'm sorry.  I -- I misspoke.
16    You haven't done any economic analysis
17 about whether any of the proposed alternatives
18 would be economically acceptable.
19 A.  Not -- not the non-infringing
20 alternatives that have been identified by Cisco.
21 Q.  If a Cisco witness were to tell the jury
22 that in the U.S. customers are actually using the
23 alternatives and that they're commercially
24 acceptable to Cisco's customers, would you agree
25 that that would impact the reasonable royalty in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Lasinski, Michael J.                                February 17, 2021

57 (Pages 222 to 225)

---

**222**

this case?
    A.  I don't know how to answer that.  As I
sit here, my understanding is that there are no
non-infringing alternatives at that are
acceptable.  So if the jury were to think that
there were acceptable non-infringing alternatives,
that's not part of my opinion.
    Q.  I guess, let me -- let me phrase it this
way:  You're aware that there's this dispute about
whether or not there are available non-infringing
alternatives, right?
    A.  Correct.
    Q.  And you have assumed, based on your
reliance on what Dr. Walker told you, that there
are no non-infringing alternatives available to
the parties at the hypothetical negotiation.
Right?
    A.  Correct.
    Q.  If, instead, I were to ask you to assume
that there were, in fact, non-infringing
alternatives available to the parties at the
hypothetical negotiation, you would have to redo
your analysis to consider that fact, right?
    A.  If I were -- yes, if I'm being asked to
assume that a fact is inconsistent with the facts

---

**223**

that I've assumed for my analysis, I would need to
think about -- I don't know if I would need to
redo my analysis or not, but I would need to think
about whether or not it would impact my analysis.
    Q.  Okay.  And you have not thought about
how and if the availability of non-infringing
alternatives, if you were to assume they were
available, how that would impact your analysis.
True?
    A.  Correct.



---